# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

JOSEPH LONGO, JUSTIN LONGO,
LOIS SPATZ, EAVEN SPATZ, RAINA
POMEROY AND MAXWELL
NASSAR, individually and on behalf of
all others similarly situated,                    CASE NO.:  8:20-cv-02651-KKM-TGW

      Plaintiff,

v.

CAMPUS ADVANTAGE, INC., and
BYL COLLECTION SERVICES, LLC

      Defendants.

---

## MEMORADNUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

---

### Argument Summary

Plaintiffs ask this Court to provide equitable and monetary relief for fees for services the Defendant Campus Advantage Inc., ("Campus Advantage") did not and could safely provide because of the dangers of COVID-19.  Plaintiff Eaven Spatz perhaps said it best when she begged Campus Advantage on March 17, 2020 to act "humanely in these trying times and offer either a heavy discount or option to terminate the lease." (**Exhibit A**, Spatz E-mail March 17, 2020). The goal of this lawsuit is to achieve that equitable goal.

1

Each Plaintiff and all Class Members have the same contract for housing at Campus Advantage's Florida Student Properties[1]. These properties are high-density private dorms specifically designed and marketed to students at many of Florida's colleges and universities. Because of COVID-19 and state-wide college campus shutdowns, student Plaintiffs[2] and class members could not safely occupy the housing and receive the bargained-for services, yet the Campus Advantage has refused to refund any portion of their payments, despite the fact that the surrounding university dorms and apartments with very similar housing situations *did in fact* provide refunds and ceased collection activity. But Defendant Campus Advantage not only sought the rent and fees at issues, they hired a third party debt collector, Defendant BYL Collections, to go after the students and their families. This case presents these questions, all of which can be resolved for all class members in this single proceeding:

1. Did Campus Advantage's inability and failure to provide services frustrate the purpose of the housing contracts? And, given the COVID-19 pandemic and the severe restrictions on activities that form the basis of the services available at Campus Advantage's Florida Student Properties, were the contractual obligations impossible to perform?

2. Did Campus Advantage breach its contracts with the Plaintiffs and class members?

---

[1] "Campus Advantage's Florida Student Properties" shall refer to The Verge, Northgate Lakes, Torchlight Townhomes, Forum Tallahassee, Campus View Place, and Lyon's Corner (Ex B. at 19:9-17).
[2] "Student Plaintiffs" shall refer to Justin Longo, Eaven Spatz, and Maxwell Nassar

3.  Did Campus Advantage breach the implied duty of good faith and fair dealing?

4.  Was Campus Advantage unjustly enriched by retaining rent and fee payments?

5.  Did Campus Advantage commit conversion?

6.  Did Campus Advantages conduct constitute money had and received?

7.  Did the Campus Advantage harass Plaintiffs and class members in an attempt to collect an illegitimate debt?

8.  Did BYL Collection's conduct toward the Spatz Plaintiffs and Sub Class constitute harassment under the Florida Consumer Collection Practices Act and Fair Debt Collection Practices Act?

Defendants' defenses apply to all Class Members, making a class-wide resolution the best and most efficient means of resolving this dispute — which, because of the relatively small sums involved, cannot be reasonably brought on an individual basis. Plaintiffs respectfully urge this Honorable Court to grant their motion.

## Background

Plaintiffs and Putative Class Members were college students and residents (or guarantors for residents) at Campus Advantage's Florida Student Properties that are private dorm-like student housing complexes. Student Plaintiffs and Class Members vacated Campus Advantage's Florida Student Properties after their colleges shut down in response to the COVID-19 pandemic. (Doc. No. 34 ¶ 70, 72 and 78).

Campus Advantage's Florida Student Properties are high-density student housing complexes for college students. *Id.* ¶ 1. They offer a comprehensive college-student housing experience by offering residents a college dormitory life with closely

packed shared living quarters, on-site group study lounge, "organized resident activities through our Students First Residence Life program," free printing, shuttle services to the campus, swimming pools, game rooms, fitness centers and "sophisticated roommate matching program." *Id.* ¶¶ 1,18. Campus Advantage's advertising and marketing targets college students across the state. *Id.* ¶¶ 15,16, 18. As operator and manager of the properties, Defendant Campus Advantage exercised plenary decision-making authority as to amenity closures, canceling services, and the refusal to release Plaintiffs and Class Members from their respective lease agreements. Campus Advantage's decisions were universal across all its Florida properties admitting that decisions "are made company-wide by upper management at [their] corporate office." *Id.* ¶ 73. Campus Advantage's handling of the COVID-19 pandemic was the same at each of their Florida Properties (**Exhibit B**- D. Oltersdorf Tr. at 162:3-163:13).

When COVID-19 struck, high-density dormitories like Campus Advantage's Florida Student Properties became unsafe and dangerous. (Doc. No. 34 ¶ 2). In response, colleges across Florida, including those served by Campus Advantage closed their campuses and dormitories, moved classes online, and issued refunds. *Id.* ¶¶ 52, 59, 68. Campus Advantage's Florida Student Properties closed its on-site offices, closed all amenities, canceled all events, and enacted a policy to address only the most urgent maintenance issues, in order to protect their staff from COVID. While Campus Advantage ignored the reality that shared living quarters were dangerous to inhabit as a result of the pandemic, forcing the student Plaintiffs and Class Members home, it

has now changed its tune as the new class of college residents moved in, posting prominently on its website:

> USE THE FACILITIES AT YOUR SOLE RISK. ALWAYS ASSUME THAT ANYONE COULD HAVE COVID-19. The Landlord and property manager make no representation or warranty that Facilities are free of COVID-19 or that persons using the Facilities are not infected with COVID-19. COVID-19 is highly contagious and is believed to spread primarily through person-to- person contact, airborne contaminants, and contact with surfaces. Residents may be exposed to or infected with COVID-19 at the Property or **as a result of residing at the Property or using any of the Facilities**, and such exposure or infection may result in **personal injury, illness, permanent disability or death**.  https://campusadv.com/covid19-old/covid-19-rules-and-regulations/ (accessed February 16, 2021, emphasis added).

Because of the pandemic closures, the vast majority of the residents at Campus Advantage's Florida Student Properties, including the Student Plaintiffs, vacated the dorm and returned home, yielding to orders from their schools, Governor DeSantis, and the CDC. *Id.* ¶¶ 70, 72, 78, 85. At university-run facilities, students were asked to evacuate dormitories with similar layouts to Campus Advantage's Florida Student Properties. And recognizing that it would be inequitable and improper to charge students for housing that became unsafe to occupy, these educational institutions have been refunding housing money to students and their families. *Id.* Defendants, on the other hand, refused to do so. *Id.* ¶ 60. Although Campus Advantage's Florida Student Properties could not be safely occupied by the students, and the bargained-for amenities and services could not be safety provided, Defendant Campus Advantage has refused to return *any* portion of the rent and other fees it collected.

Instead, Defendant Campus Advantage retained Defendant BYL Collections to harass students and their families like the Spatz Plaintiffs, on their behalf, to collect

5

illegitimate debts for services Campus Advantage could not and did not provide. *Id.*
¶¶ 10, 39, 77. And on top of that, Campus Advantage received a $2,000,000 million
forgivable Payment Protection Plan Loan from the federal government to offset losses
caused by the pandemic. *Id.* ¶ 3. Ultimately, Campus Advantage sought to have its
cake and eat it too.

Defendant Campus Advantage knew that the purpose of the student housing
lease between itself and Plaintiffs and putative Class Members was frustrated due to
COVID-19. *Id.* ¶¶ 17, 81–84. Defendant advertised their Florida properties as "luxury
student apartments" steps away from campus, with university involvement and
resident activities through their "Students First™ Residence Life Program." *Id.* ¶¶ 1,
15, 18, 19. But when Governor DeSantis closed Florida universities with the purpose
of students to "return home"[3] there was no reason for residents to remain in their
"luxury student apartments" that now had none of the bargained-for amenities and
very limited maintenance and other services. *Id.* Nor, as Defendant Campus
Advantage later admitted via the COVID-19 warning on its website, was it safe for
students to remain. *Id.*

After the closures and move outs, Defendant Campus Advantage sent mass
emails to putative Class Members, including Plaintiffs, demanding rental payments

---

[3] Emily Bloch, *Coronavirus: DeSantis announces working with universities to keep students home,* The
Florida Times-Union (Mar. 17, 2020, 12:33 p.m. ET),
(https://www.jacksonville.com/story/news/local/2020/03/17/coronavirus-desantis-announces-
working-with-universities-to-keep-students-home/112247846/)

and denying any contract cancellations or modifications. *Id.* ¶ 63, 108. Defendant

Campus Advantage stated:

> "We want to directly address the concerns we know several of you have about your lease agreements, we are empathetic with the challenges the COVID-19 pandemic is creating nationally and globally, and the impact it's having on student lifestyle, **including campus closures; online course attendance; transitions back to cities, state, or even nations of origins; and concerns over employment**. Regretfully, these circumstances are outside of our control, and while we realize that you and your family may be facing uncertainty with employment or source of income, which can result in challenges making rent payments, **we are not able to release residents from lease obligations at this time.**" Pl.'s Am. Compl. Ex. B (Doc. No. 34-3) (emphasis added).

As shown above, Campus Advantage made clear it expected payment. As early as

March 19, 2020, Campus Advantage knew the purpose of the contract with the

Putative class had been frustrated and impossible to perform.

Like all Putative Class Members, students Plaintiffs resided at Campus

Advantage's Florida Student Properties and, along with their guarantors, executed a

Lease Agreement with Defendants from August 2019 through July 2020. *Id.* ¶¶ 21, 29,

45. Campus Advantage's Florida Student Properties serve many colleges and

universities across the state, including Florida State University, University of Florida,

Valencia College, and the University of Central Florida, where the named Student

Plaintiffs attend school. *Id.* ¶ 1, 15-16. Student Plaintiffs chose one of Campus

Advantage's Florida Student Properties specifically because of its student-centered

services. *Id.* ¶ 1, 18-19. After signing the lease, Plaintiffs Spatz and Nassar paid $769

per month, and Plaintiff Longo paid $735 a month, for room, board, and utilities like trash, pest control, cable, and internet. *Id.* ¶¶ 22, 30, 46, 75 n. 16.

On March 16, 2020, former-President Trump and the Center for Disease Control and Prevention issued the "15 days to slow the spread" guidance, providing social distancing guidelines like avoiding gatherings of more than 10 people. *Id.* ¶ 51. On March 17, 2020, the State University System of Florida canceled all classes and on-campus events. *Id.* ¶ 52. On the same day, Florida Governor DeSantis announced he "wants college students to go home – and stay there."[4] Governor DeSantis emphasized that the purpose of moving to remote classes is so that students "actually return home." *Id.* Plaintiffs and Putative Class Members complied.

While the named Plaintiffs did not believe they owed Campus Advantage full rent for March 2020, each Plaintiff's lease obligations were paid in full through April 1, 2020. (**Ex. A**, at 52:9-16; 63:16-20; 73:22-24)

As of April 6, 2020, Defendant Campus Advantage had actual knowledge that Plaintiff Longo had vacated the premises, that his family could not afford to pay for a vacant student apartment with both parents out of work due to the pandemic. However, Defendant continued charging the Longos not only their monthly rent, but also *daily* late fees. (**Exhibit C**, Longo Payment Ledger, DEF 000283-000313). Campus Advantage sent the Longo Plaintiffs account to BYL Collections who then sought to collect $3,265.00 in rent, late fees and penalties, despite the Longos returning

---

[4] *Supra.*, Bloch, Emily

possession of the student apartment in April 2020. (Doc. 34-5).

On March 17, 2020, the day that UCF announced the canceling of all in-person classes and campus events, Plaintiff Eaven Spatz emailed Campus Advantage and asked the company to act "humanely in these trying times and offer either a heavy discount or option to terminate the lease." (**Ex. A**). Defendant refused. When the Spatzes removed the final belongings from the private dormitory, they encountered an insect infestation suggesting the complex was not being properly cleaned and maintained during the pandemic, as stated in the lease agreement. (Doc. 34, ¶75). Despite the Spatzes returning possession of the property to Campus Advantage on April 9, 2020, and despite knowledge the Spatzes were represented by counsel, Campus Advantage contacted the Spatzes directly through their debt collector BYL Collections who attempted to collect $3,356.00 in rent, late fees and penalties, for a student apartment that was no longer safe to inhabit, and for services that Defendant Campus Advantage were no longer able to perform.

Plaintiff Pomeroy contacted Campus Advantage by email on March 19, 2020, inquiring about prorated or discounted rent in light of all of the campus closures and government orders sending students home. (**Exhibit D**- Pomeroy Email, March 19, 2020) Just eight minutes later, a representative from Campus Advantage replied that full rent payments were still expected monthly. *Id*. Despite moving out in March and turning in his keys on April 11, 2020, Defendant actively sought and collected full

payment from Plaintiffs Nassar and Pomeroy, resorting to harassing phone calls and collection emails. (Doc. 34 ¶¶ 78-79).

## Proposed Class Definition

With benefit of discovery and further case development and consideration, Plaintiff proposes a class and sub-class definition that is slightly modified from the original proposed class definition in the complaint. *See Prado-Steiman v. Bush,* 221 F.3d 1266, 1273 (11th Cir. 2000) ("[T]he scope and contour of a class may change radically as discovery progresses and more information is gathered about the nature of the Putative Class Members' claims.").

By this motion, Plaintiffs request certification of the following class:

> All people who paid or were responsible for the costs of rent and fees for or on behalf of residents in Defendant Campus Advantage's Florida student housing complexes who (1) moved out after March 17, 2020, but before the expiration of their lease term, and either (a) paid the costs of rent and fees for the months of March, April, May, June and/or July 2020, or (b) did not pay, but were charged rent and fees for these months.

And the Spatz Plaintiffs request certification of the following sub-class:

> All people responsible for the costs of rent and fees for or on behalf of residents in Defendant Campus Advantage's Florida student housing complexes who (1) moved out after March 17, 2020, but before the expiration of their lease term, and (2) who were contacted by BYL Collection Services seeking to collect room, board, and fees on behalf of Campus Advantage.

## Argument

**A.    The proposed class and sub-class are ascertainable.**

Class certification first requires that Plaintiffs satisfy the implied Rule 23 prerequisite that a class be ascertainable — a class that is "adequately defined and clearly ascertainable." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302-03 (11th Cir. 2021) (cited authority omitted). Ascertainability requires that Class Membership be "capable of being determined." *Id.* at 1303 (cleaned up). But "membership can be capable of determination without being capable of *convenient* determination. Administrative feasibility is not an inherent aspect of ascertainability." *Id.*

Class Membership is determinable through a combination of the Defendant Campus Advantage's records and information from Class Members. For instance, Campus Advantage records tracked room occupancy through surveys, unit checks, tracking key returns and other correspondence. (**Ex. B**. at 89:20-90:1; 135:13-18; 137:12-24). During the relevant time period, Campus Advantage kept "ongoing spreadsheets" and "ongoing records" to "indicate where [they] had empty units." (**Ex. B**. 94:18-22) Although Campus Advantage "always tried to keep track of which apartments are occupied. [They] made an extra effort to determine people's status through surveys starting in April." (**Ex. B**, at 88:23-89:4). This was true for not only the Verge and Northgate Lakes, but all their properties. (**Ex. B**, at 89:18-19). Knowing all residents would not respond, Campus Advantage instructed their managers, for all their student properties, nationwide, to begin calling residents who had not responded on March 26, 2020. (**Ex. B**, at 102:19-103:6). Campus Advantage also tracked key

returns. (**Ex. B**, at 80:4-9).[5] As for the sub-class, Campus Advantage's records tracked which accounts were sent to BYL Collections for further collection activity.  (**Ex. B** 144:12- 145:1).

If there are gaps in the Defendants' records, Defendants cannot rely on their own failures in record keeping to defeat class certification. *Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099, 1150 (W.D. Mo. 2020); citing *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 668 (7th Cir. 2015) ("[R]efusing to certify on this basis effectively immunizes defendants from liability because they chose not to maintain records of the relevant transactions"); see also *Meinders D.C., Ltd. v. Emery Wilson Corp.*, No. 14-CV-596-SMY-SCW, 2016 WL 3402621, at *6 (S.D. Ill. June 21, 2016); *Zyburo v. NCSPlus, Inc.*, 44 F. Supp. 3d 500, 503 (S.D.N.Y. 2014).  Instead, the Defendants have contact information for all residents, and residents could complete questionnaires to confirm that they moved out and provide any other information necessary to determine Class Membership. *See Byrd v. Aaron's Inc.*, 784 F.3d 154, 170-71 (3d Cir. 2015) (approving

---

[5] In addition to the surveys sent, unit checks, phone calls and key returns, additional information can be obtained from additional occupancy lists ("Northgate Lakes Occupancy 3/25/2020 (**Oltersdorf trans. Ex. 18**) and ("Northgate Lakes Occupancy 7/23/2020 (**Oltersdorf trans. Ex.19**)) as well as Student Living Demographics for The Verge (**Oltersdorf trans., Ex. 20**) and Northgate Lakes (**Oltersdorf trans., Ex. 21**) Campus Advantage has provided in response to discovery requests. Unfortunately, the corporate deponent for Campus Advantage was not prepared to testify as to these documents, (**Ex. B.**, 67:17-68:4; 68:25-69:3; 108:24-109:8; 109:25-112:21; 113:2-18; 114: 15-115:21; 116:4- 120:4; 120:9-121:10; 122:7-123:10; 129:14-130:22; 131:18-132:14) other than to represent that further clarity as to the meaning of some of the notations would aid in determining occupancy. (**Ex. B.**, 138:14-139:5; 140:8-11).  "[T]he lack of knowledge answer is itself an answer which will bind the corporation at trial." *Peeler v. KVH Indus., Inc.*, No. 8:12-CV-1584-T-33MAP, 2014 WL 117101, at *8 (M.D. Fla. Jan. 13, 2014) citing *Corp. v. Jorda Enters.,* 277 F.R.D. 676, 690 (S.D.Fla. Jan.30, 2012). However, Plaintiff has scheduled the depositions of Maria Ippolito, manager for Northgate Lakes on September 16, 2021 and Marianne Farrington, manager for the Verge on September 17, 2021 to flush out the additional information this lists can provide as yet another tool to identify the class.

plan to send forms to Putative Class Members to determine if they met the class definition; "there will always be some level of inquiry required to verify that a person is a member of a class. Such a process of identification does not require a mini-trial, nor does it amount to individualized fact-finding . . . and indeed must be done in most successful class actions.") (cleaned up).

**B.    All Rule 23(a) requirements are met.**

Having demonstrated an ascertainable class and sub-class, Plaintiff next must satisfy each of the Rule 23(a) factors: (1) that the class is so numerous that joinder of all members is impracticable; (2) that there are questions of law or fact common to the class; (3) that the Plaintiff's claims are typical of the Class Members' claims; and (4) that the representative parties will fairly and adequately protect the interests of the class. Each factor is satisfied, as discussed below.

**1.    Rule 23(a)(1) – Individual joinder of all tenants is impracticable.**

Rule 23(a)'s requirement that the class be "so numerous that joinder of all members is impractical" imposes a "generally low hurdle[.]" *Vega v. T-Mobile USA Inc.* 564 F.3d 1256, 1267 (11th Cir. 2009). Numerosity does not require a showing of the precise number of Class Members, *id.*, but instead only requires "that joinder is impracticable, not impossible." *Fabricant v. Sears Roebuck & Co.*, 202 F.R.D. 310, 313 (S.D. Fla. 2010). Numerosity is usually satisfied if the class comprises 40 or more members. *See, e.g., Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986).

Here, we know of 1,613 students at The Verge and Northgate Lakes alone. (**Ex.**

**B**, 30:21-22; (34:7-10).[6]   When factoring in each of Campus Advantage's Florida Student Properties, the Plaintiffs expect this number to more than double. While the exact number of Class Members is not yet known, certification does not require that information at this stage. *Vega,* 564 F.3d at 1256 ("[A] plaintiff need not show the precise number of members in the class."). And besides, this information can be confirmed by Class Members themselves. For now, it is fair and logical to say that most residents moved out of the facilities. Therefore, numerosity requirement is satisfied.

> ### 2.      Rule 23(a)(2) – There are common questions of law or fact.

Federal Rule of Civil Procedure 23(a)(2) requires that there be "questions of law or fact common to the class." Commonality is another "low hurdle." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009). Plaintiff need only show that the class claim presents "at least one issue whose resolution will affect all or a significant number of the Putative Class Members" and is "susceptible to class-wide proof." *Id.* at 1355. Put differently, Plaintiff must identify a common contention whose "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Here, the same written contract was executed by each class member, and each class member's rescission (Count One); breach of contract (Count Two); breach of implied covenant of good faith and fair dealing (Count Three) and unjust enrichment

---

[6] Plaintiff's Motion to Compel, to the extent it pertains to **all** of Campus Advantage's Florida Student Properties has been deferred until a ruling on Class Certification. [Doc. 58]

(Count Four) claims arise out of rights conveyed by those contracts. Each class member resided in Campus Advantage's Florida Student Properties; each class member contracted for the building's student housing qualities and amenities; and each class member was deprived of those qualities and amenities, which became unsafe and dangerous due to the COVID-19 pandemic.

While some Class Members were able to pay rent during the early months of the pandemic, some did not but were nonetheless subjected to collection harassment. Identifying those circumstances will not be particularly difficult, and can be established by the Defendants' records or by supplemental information from each class member, if necessary.

At bottom, the common questions pertinent to Count One (rescission) include the following. By depriving the Plaintiffs and all Class Members of the benefits of the dormitory-living at Campus Advantage's Florida Student Properties, did the Campus Advantage equitably breach its obligations? Did the Campus Advantage's inability and failure to provide its student-centered services frustrate the purpose of the housing contracts? And, given the COVID-19 pandemic and the severe restrictions on activities that form the basis of the services available at Campus Advantage's Florida Student Properties, were the contractual obligations impossible to perform?

For Count Two, did Campus Advantage breach their contract with Plaintiffs and Class Members by closing the amenities and canceling services specifically contemplated in the agreement between the parties?

For Count Three, did Campus Advantage breach the implied covenant of good

faith and fair dealing by: (1) asserting that remaining in dormitories during a pandemic was a reasonable option; (2) representing itself as a private dormitory and then claiming Plaintiffs and Class Members were not entitled to refunds when the schools closed; and (3) refusing to return unused funds?

For Count Four, was Campus Advantage unjustly enriched by retaining rent and fee payments despite the fact it closed its facilities and could not provide the services for which Plaintiff and the Class Members paid?

For Count Five, did Campus Advantage commit conversion when Plaintiffs and Class Members were deprived of the money and value they paid (or the students on whose behalf they paid for) for their right to the services and amenities provided in the lease agreement?

For Count Six, did receiving money in the form of room, board, and fee payments that was intended to be used for the benefit of Plaintiffs and the Class and then failing to give back or refund the wrongfully obtained money and fees to Plaintiffs and the Class constitute money had and received?

Last, for Count Seven, did the Campus Advantage's demands for payment despite the closures constitute demands for payment of an illegitimate debt? And based upon the totality of circumstances, were Defendant's collection demands harassing?

Each sub class member also has common questions of law or fact as to Counts Eight and Nine (FCCPA and FDCPA), such as did BYL Collection's conduct constitute harassment?

These common questions can be answered as to all Class Members, and their

resolution can determine the validity of all claims thus satisfying the commonality requirement.

3. **Rule 23(a)(3) – The Plaintiff's claims are typical of those of class and sub Class Members.**

"The focus of typicality is whether the class representative's interest is aligned enough with the proposed Class Members to stand in their shoes for purposes of the litigation and bind them in a judgment on the merits." *Palm Beach Golf Center-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 696 (S.D. Fla. 2015). "Class Members' claims need not be identical to satisfy the typicality requirement; rather, there need only exist a sufficient nexus . . . between the legal claims of the named class representatives and those of individual Class Members to warrant class certification." *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012) (cleaned up). "This nexus exists 'if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.'" *Id.* "'The typicality requirement may be satisfied despite substantial factual differences . . . when there is a strong similarity of legal theories.'" *Williams*, 568 F.3d at 1357 (alteration in original).

Here, just like the student Plaintiffs, each Putative Student Class Member moved out of Campus Advantage's Florida Student Properties early because of COVID-19 and every Plaintiff and class member suffered the same harms because of Campus Advantage's conduct which Defendant admits was uniformed across its Florida properties and "all resident files were handled in a consistent manner." (**Ex. B** at, 157:16-17; 161:23-162:1; 162:3-163:7). Further, every class member's claim hinges on

the application of the same contract, which makes this action especially well-suited for class resolution. 1 Newberg on Class Actions § 3:37 (5th ed.) ("In class actions based on contractual provisions, the proposed class representative's claims are generally held to be typical of the Class Members' claim where all arise out of the same general contract.").

Similarly, each sub class member was harassed by BYL Collection's debt collection tactics in attempting to collect a debt the Spatz Plaintiffs and sub Class Members did not owe.

### 4.     Rule 23(a)(4) – Plaintiffs are an adequate representative of the class.

Adequacy under Rule 23(a)(4) "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). "Adequacy exists where the named plaintiff shares common interests with the Class Members and seek the same type of relief for themselves as for the class." *In re Checking Account Overdraft Litig.*, 307 F.R.D. 656, 672 (S.D. Fla. 2015).

Here, the named Plaintiffs have no interests that conflict with the Class or Sub Class Members, and his counsel is experienced in prosecuting class actions.  (Plaintiff counsel's Declarations, **Exhibit E**). The adequacy requirement is met.

### C.    The Rule 23(b)(3) requirements are met.

Plaintiffs must also satisfy Rule 23(b)(3) by establishing that (1) common questions of law or fact predominate over questions affecting only individual Class Members, and (2) a class action is superior to other available methods of fairly and efficiently adjudicating the case. *See Id.* Each factor is discussed below.

### 1.    Common questions predominate over individual questions.

Rule 23(b)(3) requires a finding "that the questions of law or fact common to the Class Members predominate over any questions affecting only individual members[.]" "It is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions." *Klay v. Humana, Inc.,* 382 F.3d 1241, 1254 (11th Cir.2004). "Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action. Common issues of fact predominate if they have direct impact on every class member's effort to establish liability and on every class member's entitlement to relief." *Id.* (cleaned up).

Here, the only real individualized issues concern damages — for example, one class member may have paid rent for April and May, while another paid April and did not make the payment for May. These small, easily identifiable, distinctions lend themselves perfectly to class treatment. The fact that "individualized determinations [may be] necessary to determine the extent of damages allegedly suffered by each plaintiff . . . is insufficient to defeat class certification under Rule 23(b)(3). Numerous courts have recognized that the presence of individualized damages issues does not

prevent a finding that the common issues in the case predominate." *Id.*  Moreover, with regards to the sub-class, what is sought is statutory damages and therefore no individualized issues exist.

### 2.    A class action is superior to other forms of adjudication.

Finally, Rule 23(b)(3) requires a finding "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." This inquiry focuses on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs. Proper superiority analysis considers "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1184 (11th Cir. 2010).

Here, the only other form of litigation potentially available is individual lawsuits. But these cases, which involve individual damages in the range of a few thousand dollars, are prohibitively expensive and most likely would not be brought. Despite thousands and thousands of students and families being out similar damages undersigned is aware of an individual lawsuit to recover these monies. The class action device was intended to "vindicat[e] . . . the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997); *see also Carriuolo v. General Motors Co.*, 823 F.3d 977, 989 (11th Cir. 2016) (superiority met where "individual claims may be too small for a separate action by each class member"). This case is either brought as a class action, or in all likelihood never brought.

Regarding the enumerated Rule 23(b)(3) factors, Plaintiffs are not aware of other actions by or against Class Members, which demonstrates that the Class Members have little interest in individually controlling the prosecution of the action. Rule 23(b)(3)(A) & (B)). Bringing this action in this forum is desirable and there is no competing forum, given the lack of any other actions. (Rule 23(b)(3)(C)). As discussed *infra*, the management of the action presents no insurmountable administrative difficulties (Rule 23(b)(3)(D)). And even if it did, "[a]dministrative feasibility will rarely, if ever, be dispositive," *Cherry,* 986 F.3d at 1306, because those concerns always involve a comparison between a class resolution and alternatives — and here there are none.

Given the low dollar damages in individual cases, particularly with regard to the sub class, the Class Members' claims will either be resolved through this class action, or families will be forever deprived of this equity. Without a class, resolution will not happen, saddling Putative Class Members with illegitimate debt as they start their lives and careers. This action provides the vehicle to resolving the question of whether Class Members are obligated to pay Campus Advantage for services they could not provide safely and did not provide and whether the Sub Class Members were subject to debt collection harassment.

## Conclusion

For these reasons, Plaintiffs respectfully request this Honorable Court to grant their motion.

Respectfully submitted,

21

/s/ Amanda J. Allen
Amanda J. Allen, Esq.
Florida Bar No. 0098228
William "Billy" Peerce Howard, Esq.
Florida Bar No. 0103330
THE CONSUMER PROTECTION FIRM, PLLC
401 E. Jackson Street, Suite 2340
Tampa, Florida. 33602
Telephone: (813) 500-1500
Facsimile: (813) 435-2369
Amanda@TheConsumerProtectionFirm.com
Billy@TheConsumerProtectionFirm.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 2, 2021 I electronically filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will automatically send electronic notification to all parties of record.

/s/ Amanda J. Allen
Amanda J. Allen, Esq.

22